**Peggy WILSON, Personal Representative of the Estate of Milburn Wilson, deceased, Plaintiff,**

**v.**

**KUWAHARA COMPANY, LTD., a Japanese corporation; C.P.S.C., Inc., a Delaware corporation; Yanagihara Kogyo Company, Ltd., d/b/a Ukai, a Japanese corporation; and Circle Corporation, a Japanese corporation, Defendants.**

**No. G87–66 CA6.**

United States District Court, W.D. Michigan, S.D.

July 14, 1989.

Vander Ploeg, Ruck, Luyendyk by David M. Wells, Muskegon, Mich., Rose & Rose by James M. Rose, Montague, Mich., for plaintiff.

Warner, Norcross & Judd by John D. Tully, Grand Rapids, Mich., for defendant Kuwahara Co., Ltd.

Gary L. Stec, Harvey Kruse Westen & Milan, P.C., Grand Rapids, Mich., for defendants.

## OPINION

HILLMAN, Chief Judge.

This is a diversity products liability action removed from Muskegon County Circuit Court and controlled by Michigan law. On June 26, 1985, plaintiff Peggy Wilson's husband Milburn was killed in an accident allegedly caused by a defective bicycle wheel. Defendant and cross-plaintiff Kuwahara Company, Ltd., a Japanese firm, designed and assembled the bicycle at issue, using a wheel assembly designed and manufactured by another Japanese concern, defendant and cross-defendant Yanagihara Kogyo Company, Ltd. Yanagihara sold the wheel in Japan to a Japanese distributor, defendant Circle Corporation. Circle in turn sold the wheel in Japan to

Kuwahara, who put it on the finished bicycle and shipped the unit to the United States and defendant C.P.S.C., Inc., a Delaware corporation. C.P.S.C. transferred the bicycle to the Michigan retailer who ultimately sold it to the Wilsons. Mrs. Wilson's claims rest upon breach of implied warranty and negligence. Kuwahara's cross-claim against Yanagihara is for common-law indemnity.

This matter is before the court for a second time upon the motion brought by Yanagihara to dismiss for lack of personal jurisdiction. Because the pleadings closed before the present motion's filing, the court will treat the motion as one for judgment on the pleadings. Fed.R.Civ.P. 12(c). On March 7 and March 15, 1989, the court issued respectively an opinion and order granting the motion, but staying Yanagihara's dismissal pending further discovery on the jurisdictional issue by Kuwahara and Mrs. Wilson.

Mrs. Wilson has not filed any further documents regarding the court's jurisdiction over Yanagihara. She apparently no longer contests Yanagihara's jurisdictional defense, and is anxious to proceed to trial against the remaining defendants. Kuwahara, however, has submitted supplementary arguments and evidence seeking to vacate the court's earlier decision.

## I. Waiver

The court has reconsidered its March 7 ruling that Yanagihara's participation on the merits did not waive its jurisdictional defense. No one doubts the propriety of exercising personal jurisdiction where a defendant has failed to raise a timely challenge, or where a defendant's participation in the case amounts to waiver of a timely challenge. See, e.g., United States v. Gluklick, 801 F.2d 834, 837 (6th Cir.1986), cert. denied 480 U.S. 919, 107 S.Ct. 1376, 94 L.Ed.2d 691 (1987). Here, Yanagihara preserved its personal jurisdiction objection by assertion in its answer and cross-answer. Fed.R.Civ.P. 12(b), 12(h)(1)(B). The issue therefore becomes whether Yanagihara has participated sufficiently for the court to find a waiver of its timely personal jurisdiction objection.

Kuwahara contends that Yanagihara's participation in discovery and other pretrial activities amounts to waiver of its jurisdictional defense, because Yanagihara has put the other parties to some expense and created a reasonable expectation that the case would go forward on the merits. In support of its position, Kuwahara essentially relies on a series of decisions from the Southern District of New York. See, e.g., Benveniste v. Eiseman, 119 F.R.D. 628 (S.D.N.Y.1988); Burton v. Northern Dutchess Hospital, 106 F.R.D. 477 (S.D.N.Y.1985); Vozeh v. Good Samaritan Hospital, 84 F.R.D. 143 (S.D.N.Y.1979). These decisions of course do not bind this court. The court finds the New York cases to be distinguishable and declines to follow their reasoning under the present circumstances.

The conduct on the merits that prompted the waiver of jurisdictional defense holdings in the New York cases was far more extensive and prejudicial than that of Yanagihara in this case. In Benveniste, the defendant waived his jurisdictional defense by conducting discovery for three years right up to the discovery deadline, and failing to raise the defense at seven pretrial conferences. 119 F.R.D. at 629. In addition, defendant's inequitable delay in pursuing the jurisdictional defense resulted in the expiration of the limitations period on plaintiff's sole claim. Id. at 630.

In Burton, waiver stemmed from defendants' participation in "extensive" discovery for more than three years, their repeated stipulations for delay and scheduling extensions, and their failure to bring a motion to dismiss until after the final pretrial conference and plaintiff's motion to strike the defense. 106 F.R.D. at 480–81. Similarly, defendant in Vozeh failed to present proof of an asserted jurisdictional defect for close to two years, despite participating in three pretrial conferences. Defendant finally presented the jurisdictional issue to the court less than one month before trial. 84 F.R.D. at 144.

In contrast, in this case Yanagihara participated on the merits for about 14 months before filing its motion to dismiss and accompanying affidavit on December 30, 1988

—three months before the discovery deadline and six months before the trial date set by the court. Yanagihara's discovery activity was not great. It merely answered some interrogatories and initiated several depositions. There was only one magistrate status conference in the case between Yanagihara's entry and the filing of its jurisdictional motion. Moreover, unlike the situation in *Benveniste*, a finding here that Yanagihara did not waive its jurisdictional defense does not leave Mrs. Wilson without a claim, since Kuwahara and others remain as defendants. Likewise, Kuwahara does not argue that granting the present motion will leave it without recourse on its cross-claim against Yanagihara in another forum enjoying proper personal jurisdiction.

■ The courts in the New York cases were undoubtedly correct in finding jurisdictional defense waivers under the circumstances there presented. This court holds, however, that in the very different circumstances prevailing here, it would be unduly harsh to penalize Yanagihara by finding it waived its jurisdictional objection by engaging in a moderate amount of pretrial activity for a relatively short period of time after properly raising that objection. This is especially so when Yanagihara is asserting a constitutional right not to be sued in a forum with which, on this record, it has no connection whatsoever. Certainly, the court should not lightly presume waiver of an important due process right. Rather, the court should reserve finding waiver to those situations where a defendant's prejudicial conduct is at least as inexcusable as that discussed in the New York cases.

The court's reluctance to find waiver is reinforced by the fact that, as pointed out on March 7, Yanagihara complied with the letter of Fed.R.Civ.P. 12(d) in bringing its jurisdictional defense to the fore. Rule 12(d) provides only that a personal jurisdictional defense must be heard and determined before trial, unless the court otherwise directs. Both the *Benveniste* and *Burton* courts acknowledged that literal compliance with the rules is a mitigating factor in judging whether or not to find waiver in a given situation, although in those cases compliance could not outweigh other egregious aspects of defendants' conduct to preserve the jurisdictional defense in perpetuity. 119 F.R.D. at 629; 106 F.R.D. at 481.

Here, Yanagihara cannot be faulted for timely following the procedure explicitly laid out in Rule 12(d), rather than some other procedure that might have been more convenient to the court or to the other parties. *Cf. State Bank of Coloma v. Natl. Flood Ins. Program*, 851 F.2d 817, 821 (6th Cir.1988) ("[w]here the Federal Rules of Civil Procedure provide the means to remedy a mistake, as they do here, equity does not require the court to provide an additional procedure").

Contrary to Kuwahara's assertion, Yanagihara's discovery activity before filing the present motion did not "ambush" Kuwahara or Mrs. Wilson. Nor does the court's indulgence of Yanagihara's conduct give to Yanagihara the "best of both worlds."

Kuwahara and Mrs. Wilson were on notice of the jurisdictional defense in October 1987. The probability of Yanagihara's assertion that it lacked a due process connection with Michigan should have been obvious. If Mrs. Wilson and Kuwahara did not want to participate in discovery on the merits with Yanagihara, at the outset of the litigation they could have brought a Rule 12(d) or Rule 12(f) motion to test *the merits* of Yanagihara's constitutional defense (although such a motion, as Kuwahara points out, would not have been helpful on the waiver issue because no dilatory conduct had yet occurred), and sought an order limiting discovery to the jurisdictional issues of minimum contacts and the fairness or suit against Yanagihara in this court. Significantly, plaintiffs in *Burton* chose a motion to strike to bring the jurisdictional issue to a head in that case. 106 F.R.D. at 480. Mrs. Wilson and Kuwahara chose not to do so here, and Kuwahara cannot now escape the consequences of that choice.

For the foregoing reasons the court reaffirms its finding that Yanagihara did not waive its jurisdictional defense.

## II. The Merits

The court has also reconsidered its March 7 finding that it cannot constitutionally exercise personal jurisdiction over Yanagihara. That finding was based upon Mrs. Wilson's and Kuwahara's complete failure to produce any evidence bearing upon the sufficiency of Yanagihara's contact with Michigan. The party asserting personal jurisdiction, here primarily Kuwahara, of course carries the burden of establishing its factual basis. *Serras v. First Tennessee Bank National Ass'n,* 875 F.2d 1212, 1213–14 (6th Cir.1989). The additional discovery time granted by the court has allowed Kuwahara to now bring forward some evidence of Yanagihara's Michigan connection.

The Sixth Circuit has recently provided guidance to the court in how it should approach assessment of Kuwahara's jurisdictional evidence. In *Serras,* the court made clear that a district court reviewing the parties' pretrial written submissions on the issue of personal jurisdiction need only determine whether the party asserting jurisdiction has made out a *prima facie* case. If the party asserting jurisdiction establishes her *prima facie* case, she may proceed to trial, where she still must prove the necessary jurisdictional facts by a preponderance of the evidence.

To establish a *prima facie* case, the party asserting jurisdiction must set forth, by affidavit or otherwise, specific facts showing that the court has jurisdiction. If the submissions of the party asserting jurisdiction state the jurisdictional facts with sufficient particularity, then the reviewing court is obligated to ignore contrary factual assertions by the party contesting jurisdiction. The latter party naturally may present evidence on the jurisdictional issue at trial without waiving the defense. 875 F.2d at 1213–15.

Applying *Serras* to this case, the question becomes whether Kuwahara's asserted jurisdictional evidence is sufficient to establish a *prima facie* case for this court's exercise of personal jurisdiction over Yanagihara. It clearly is not. Kuwahara's evidence consists of the following:

1. Yanagihara's answer to Kuwahara's third interrogatory, which states (usage in the original) that "Yanagihara does not now nor have they ever sold their product directly to the United States. Instead, Yanagihara's products are sold to various customers in Japan for use in their products. Yanagihara is unaware of the end use their product is put to after it is sold to these Japanese customers. Upon information and belief, Yanagihara believes that the bicycle rims it manufactures might be incorporated into bicycles as a component thereof and ultimately distributed to the United States by other companies unassociated with Yanagihara."

2. Yanagihara's answer to Kuwahara's fifth interrogatory, showing that Yanagihara sold Kuwahara ¥ 54 million worth of goods in 1984 and 1985.

3. Excerpts from the 1989 and 1987 English-language versions of *Japan's Bicycle Guide,* distributed in the United States and containing promotions regarding Yanagihara products.

4. A February 1988 issue of *Cycle Press International,* written in English and distributed in the United States, containing Yanagihara product promotions.

5. The affidavit of Cynthia Meachum, a paralegal for Kuwahara's counsel, relating a telephone conversation she had with a Seattle bicycle shop employee, who told her that the shop stocked Yanagihara products and distributed "bicycle supplies" to Michigan bicycle shops. The affidavit also relates Meachum's telephone conversation with Matt Coulter, an employee of Ritchey U.S.A., who told Meachum that some Ritchey Vantage rims are manufactured by Yanagihara. Attached to the affidavit are several undated bicycle part specification sheets, and excerpts from the 1989 *Bicycle Buyer's Guide.*

6. The affidavit of Rene Loiselle, a Livonia, Michigan bicycle shop employee, stating that catalogues provided to Michigan bicycle shops have contained advertisements concerning Yanagihara products, and also stating that his shop sells Yanagihara products by means of an established distribution system. The affidavit additionally states that the Michigan bicycle parts distributor where Loiselle worked from 1982 to 1985 stocked Yanagihara products for sale to Michigan retail stores by means of an established distribution system.

Kuwahara also asserts in its brief that Yanagihara has an insurance policy that protects it against Michigan products liability claims. The court has not considered this alleged policy because statements made in briefs are not evidence.

█ As the court stated on March 7, in a diversity case the law of the forum state determines the extent of the federal court's personal jurisdiction. *American Greeting Corp. v. Cohn*, 839 F.2d 1164, 1167 (6th Cir.1988). This court's personal jurisdiction in this action accordingly depends on the Michigan long-arm statute, M.C.L.A. § 600.715. For present purposes, Michigan long-arm jurisdiction reaches to the limits of due process. *Serras*, 875 F.2d at 1216.

█ As the court also stated on March 7, the due process clause forbids the exercise of long-arm jurisdiction over nonresident defendants having insufficient minimum contacts with the forum state to make such exercise agree with traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). This constitutional test has two elements: "minimum contacts" and reasonableness under the circumstances. *See Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). The Sixth Circuit has in turn summarized these two elements in terms of a three-part standard:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Serras*, 875 F.2d at 1217.

The law of "purposeful availment," the first element of the *Serras* test, is well-developed. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985). Over the years, the Supreme Court has identified a number of factors the courts should consider in determining purposeful availment. These include whether the defendant closes sales or performs services in the forum state, whether she solicits sales there by means of advertising or a sales agent, and whether she directly or indirectly serves or seeks to serve the forum's market. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980).

On this last point, four justices have stated that "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agree to serve as the sales agent in the forum State." *Asahi Metal*, 480 U.S. at 112, 107 S.Ct. at 1033 (opinion of the court).

Four other justices have found sufficient indirect purpose to serve the forum's market where a defendant places a product in the stream of commerce outside the forum state "aware that the final product is being marketed in the forum State." *Id.* at 117, 107 S.Ct. at 1035 (Brennan, J., concurring). In Justice Stevens' view, "a regular course of dealing" outside the forum state, resulting in a large number of deliveries in the forum state over several years, would in most circumstances amount to indirect service of the forum's market, and thus pur-

poseful availment of the privilege of conducting activities in the forum state. *Id.* at 122, 107 S.Ct. at 1038 (Stevens, J., concurring).

Kuwahara's evidence fails at numerous points under these principles. First of all, the third, fourth, and fifth items of evidence listed above, as well as the first seven paragraphs of the sixth item, do not establish *prima facie* that Yanagihara conducted any activity in the state of Michigan that gave rise to Mrs. Wilson's claim or Kuwahara's cross-claim. Those items merely suggest that Yanagihara might have had some connection with Michigan in 1987, 1988, or 1989. The underlying cause of action in this case, however, arose on June 26, 1985. The listed items of evidence therefore fail to satisfy the second element of the *Serras* due process test. *R.L. Lipton Distributing Co. v. Dribeck Importers, Inc.*, 811 F.2d 967, 969 (6th Cir.1987).

The first and second items of evidence listed above, along with the final three paragraphs of the sixth item, at least have something to do with the relevant time period. Nevertheless, these items fail the first prong of the *Serras* test, under all the competing views of "purposeful availment" expressed in *Asahi.* As for the first item, applying the most lenient *Asahi* standard and assuming that Yanagihara's awareness of distribution of its products in the United States in 1985 qualifies as purposeful availment of the American market, 480 U.S. at 117, 107 S.Ct. at 1035 (Brennan, J., concurring), Yanagihara's answer to Kuwahara's third interrogatory cannot be read in context, even when construed in Kuwahara's favor, as an admission that Yanagihara knew its products were being distributed in the United States. The answer only states that Yanagihara does not know where its products ultimately end up, although it believes the United States *might be* one destination.

Moreover, even if the answer were construed as such an admission, Yanagihara's awareness that its products might be distributed in the United States does not translate into an awareness of distribution in Michigan. As the Sixth Circuit stated while construing the Michigan long-arm statute in *Serras*, "the defendant must purposefully avail himself of the privilege of acting *in the forum state* or causing a consequence *in the forum state.*" 875 F.2d at 1217 (emphasis added). *Cf. World–Wide Volkswagen*, 444 U.S. at 293, 100 S.Ct. at 565 ("we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes").

Similarly, on the second item of evidence listed above, Yanagihara's answer to Kuwahara's fifth interrogatory, the mere fact that Yanagihara did substantial business with Kuwahara in Japan in 1984 and 1985 does not show purposeful availment of a Michigan forum under *Serras*. Kuwahara has presented no evidence that Yanagihara was aware that Kuwahara put Yanagihara parts on Kuwahara's bicycles and sent them to the United States or Michigan. Although Kuwahara's brief states that "[a]s alleged in Mrs. Wilson's complaint, and not contradicted by Yanagihara, Yanagihara's wheel was indeed incorporated into the bicycle at issue and distributed into the United States and Michigan," *Serras* states that the party asserting a *prima facie* case for jurisdiction may not rely upon her own, or presumably anyone else's, pleadings. 875 F.2d at 1213–14.

Kuwahara likewise has not submitted any evidence that any of the ¥ 54 million paid by Kuwahara to Yanagihara derived from or was related to the sale of Kuwahara products in Michigan. Any economic benefit Yanagihara received from Kuwahara's Michigan activities therefore cannot have been more than tangential. Attenuated economic benefits derived from use of a product in the forum state do not justify the exercise of personal jurisdiction in that state. *World–Wide Volkswagen*, 444 U.S. at 298–99, 100 S.Ct. at 567–68.

The final item of evidence relied upon by Kuwahara is the Loiselle affidavit, the sixth item listed above. As alluded to above, the first seven paragraphs of this document dated June 13, 1989, are written in present tense and do not say anything about Yanagihara's Michigan activities in June 1985 and before. The affidavit's last

three paragraphs are Kuwahara's only evidence connecting Yanagihara to Michigan during the relevant time. These paragraphs state Loiselle worked for a Michigan bicycle parts distributor from 1982 to 1985, and that the distributor sold Yanagihara products to Michigan retail stores by way of an established distribution system.

The Loiselle affidavit does not pass muster under the first element of the *Serras* test. Loiselle's employer may well have sold Yanagihara products, but this does not *ipso facto* establish that Yanagihara purposely availed itself of the Michigan market. Kuwahara concedes that Yanagihara was not involved in direct distribution of its products to Loiselle's employer. Loiselle does not aver that Yanagihara was indirectly aware of or benefited from the employer's sales, or that it was aware of or exercised control over the alleged "established distribution system" that funneled Yanagihara products into the employer's Michigan stock. Nor does Loiselle aver that the employer stocked and sold any substantial number of Yanagihara products on any sort of regular basis. *Cf. R.L. Lipton Distributing*, 811 F.2d at 970 ("sporadic and insubstantial contacts by themselves cannot support a finding of personal jurisdiction").

The phrase "established distribution system" is not synonymous with purposeful availment. *Cf. R.L. Lipton Distributing*, 811 F.2d at 970 (supplier not responsible for distributor's established system with subdistributors). Moreover, even if the phrase indeterminately suggests some inference of purposeful availment, Loiselle does not state the basis of his knowledge of this system, nor does he explain its details or even its general outline. Instead, his affidavit is entirely vague and conclusory. This sort of evidence does not suffice to make out a *prima facie* case of 1985 Michigan contacts. *Serras* requires that the party asserting jurisdiction set forth *specific* facts in support of her contentions. 875 F.2d at 1213–14.

In sum, the court is satisfied that Kuwahara's asserted evidence does not establish a *prima facie* case sufficient to justify the exercise of personal jurisdiction over Yanagihara. A brief review of factually similar cases reinforces this conclusion. The most prominent of these is *World–Wide Volkswagen*, in which the Supreme Court held that an Oklahoma court could not constitutionally exercise personal jurisdiction over a New York automobile distributor on a record showing that the distributor's sole contact with Oklahoma was the fortuitous circumstance that one of the distributor's cars, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma. 444 U.S. at 295, 100 S.Ct. at 566. The instant record is comparable to that in *World–Wide Volkswagen*, showing little more than that Yanagihara may have caused one 1985 Michigan consequence: Mr. Wilson's accident on a bicycle with Yanagihara wheels.

Similarly, the court notes that in *Siddock v. Upton, Bradeen & James, Ltd.*, 650 F.Supp. 600, 601 (E.D.Mich.1986), Judge Feikens found, albeit in dicta, no minimum contacts in an indistinguishable factual situation. *Siddock* was a suit brought by an injured Michigan worker against a Canadian company that imported a lathe from Germany in 1966, and then sold the lathe to another Canadian company. The second Canadian company subsequently transferred the lathe to its Michigan subsidiary, plaintiff's employer. Judge Feikens found minimum contacts to exist on other grounds, but he wrote, citing *World–Wide Volkswagen*, that "[h]ad the defendant's contacts with Michigan been limited solely to the sale of the lathe in Canada to a Canadian company which eventually transferred it to Michigan, I would lack jurisdiction." 650 F.Supp. at 601. Here, of course, the evidence shows that Yanagihara's only significant Michigan connection is through the sale of a wheel in Japan to another Japanese company, who then sold the wheel in Japan to a third Japanese company, who then transferred the wheel to this country, where it found its way to Michigan.

In light of foregoing, the court reaffirms its March 7 granting of Yanagihara's motion. Yanagihara will be dismissed from

this action without prejudice to suit against it in a more proper forum.